UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CLIFF BLOSSOM,

      Plaintiff,

v.                                                      Case No. 02-73936

FORD MOTOR COMPANY,                    HONORABLE AVERN COHN

      Defendant.

_____/

## MEMORANDUM AND ORDER
## GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND DISMISSING CASE[1]

### I. Introduction

    This is an employment discrimination case involving, inter alia, alleged reverse

race discrimination.[2]  Plaintiff Cliff Blossom (Blossom), a Caucasian male, is suing

Defendant Ford Motor Co. (Ford) for what he says is "purposeful discrimination" against

him.  See Am. Compl. at ¶ 1.  Blossom asserts seven counts against Ford as follows:

| Count | Claim |
|-------|-------|
| 1 | Race Discrimination Under 42 U.S.C. § 1981; |
| 2 | Gender Discrimination Under Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e et seq.; |

---

[1] The Court originally scheduled this matter for hearing.  Upon review of the parties' papers, however, the Court finds that oral argument is not necessary.  See E.D. Mich. LR 7.1(e)(2).

[2] Reverse race discrimination is a claim by a Caucasian that the employer discriminated in favor of a racial minority.  Boger v. Wayne County, 950 F.2d 316 (6th Cir. 1991).

3        Disparate Impact Under Title VII (alleging gender
         discrimination);

4        Age Discrimination Under the Age Discrimination in
         Employment Act (ADEA), 29 U.S.C. § 621 et seq.;

5        Violation of the Family Medical Leave Act (FMLA), 29 U.S.C.
         § 2601 et seq.;

6        Retaliation in Violation of the FMLA; and

7        Disability Discrimination Under the Americans with
         Disabilities Act (ADA), 42 U.S.C. § 12101, et seq.

Before the Court is Ford's Motion for Summary Judgment. For the reasons that

follow, the motion is GRANTED and this case is DISMISSED.

## II. Background[3]

### A. Factual Background

Ford hired Blossom in 1992 as a salaried line supervisor at its Wayne Stamping

and Assembly Plant. Blossom worked in the body shop and was responsible for

supervising hourly employees that assembled automobiles.

In 1993, Blossom accepted a position as a manufacturing planning specialist at a

Ford assembly plant in Claycomo, Missouri.

In 1996, Ford promoted Blossom to production superintendent at Ford's Wixom,

Michigan, assembly plant (the Wixom plant). Blossom was responsible for managing

the body shop.

On May 18, 2001, Blossom's manager, Michael Vandelinder (Vandelinder),

disciplined Blossom in writing. Vandelinder's memo states that "[o]n an ongoing basis,

_____

[3] The background is taken from the parties' papers, primarily Ford's statement of
material facts not in dispute.

2

the Body Department has displayed a trend of deteriorating quality performance.  This performance continuously affects the plant's ability to efficiently run daily operations."  The memo warned that "[c]ontinued lack of performance to the above measures will result in further disciplinary action being taken."

On June 8, 2001, Blossom's managers, Chris Susock (Susock) and Prasad Ramakrishnan (Ramakrishnan), gave him an interim performance review that identified several areas in which Blossom's performance was inadequate.  In connection with this review, Blossom was placed on a performance enhancement plan (PEP) that Susock and Ramakrishnan monitored.  The PEP identified objectives for Blossom to accomplish, including completing a "night letter" that contained data on safety, quality, cost, and morale issues.  Subsequent to the PEP's implementation, Susock and Ramakrishnan sent emails to Blossom indicating their dissatisfaction with the "night letters" that Blossom provided.  One email from Susock in particular states that, with respect to Blossom's "night letter" of June 12, 2001, the letter failed to give Susock "any of the requirements that [they] had agreed upon that is consistent with [Blossom's] performance enhancement plan."  Susock also sent Blossom an email expressing his dissatisfaction with Blossom's failure to complete required safety procedures after a two-week line shutdown.

On August 2, 2001, Susock issued Blossom a disciplinary letter of reprimand for failing to complete a required report the day before.  The letter also stated that Blossom failed to complete similar reports on five prior occasions.

In the fall of 2001, Blossom applied for a job as an hourly sheet metal worker at the Wixom plant.  Ford offered him the job, but he did not accept it.  Also in the fall of

3

2001, David Sabol (Sabol) replaced Susock and Ramakrishnan as Blossom's manager. Sabol adopted the PEP that Susock and Ramakrishnan established for Blossom.  Sabol also met with Blossom and Cindy Kachadoorian (Kachadoorian), a Ford human resources supervisor, to review Blossom's progress under the PEP.

On November 30, 2001, Blossom had a disagreement with Sabol.  Blossom testified during his deposition that Sabol was yelling at him and that saliva from Sabol's mouth hit Blossom two or three times.  Blossom testified that he went to Ford's human resources department to report that "Dave Sabol had assaulted me, that he had slobbered all over me, and that I needed to go to medical and receive treatment and leave before something more serious developed."  Blossom drove a motorized cart to Ford's medical office.  A nurse took his blood pressure and told him to stay there. Contrary to the nurse's directions, Blossom left the Wixom plant and drove himself home.  When at home, Blossom fell asleep and his wife later woke him up.  He called Kachadoorian, who told him that he should not have left the plant without permission and that he could be subject to discipline up to discharge.  Blossom then returned to the Wixom plant's medical office and was seen by the Wixom plant's physician.  The plant physician also told Blossom that he could be disciplined and possibly discharged for leaving the plant without permission.  Blossom told the plant doctor that he had struck his head earlier in the day at the Wixom plant and had sustained a minor cut.  The doctor examined Blossom and told him to return to work without restrictions.  Rather than doing so, however, Blossom again left the plant without permission.  He worked a full shift the following day without any problems.

4

A "Performance Management Process" report dated December 3, 2001, states that Blossom "has not made any progress" on the PEP.  The report also states that "intensified discussions and coaching on his performance will commence."  After a final review, Ford terminated Blossom's employment for inadequate performance, effective February 12, 2001.  His termination was under Ford's "Career Transition Program," which gave Blossom a lump-sum severance payment of $41,429.38, representing six-and-a-half months of his annual salary.  Blossom also received continued benefits for seven months.

### B. Procedural Background

Noticeably absent from the parties' papers are details regarding the procedural history of this case.  It is well established that a plaintiff seeking relief under Title VII must first exhaust administrative remedies before filing suit.  See Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 392-98 (1982).  The parties do not discuss whether Blossom filed a complaint with the U.S. Equal Employment Opportunity Commission (EEOC) prior to filing this lawsuit.  No indication of an EEOC right-to-sue letter appears in the record.

### III. Discussion[4]

### A. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).  Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion.  See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50.  Additionally, and

---

[4] Blossom did not follow the Court's summary judgment motion practice guidelines.  He did not (1) submit a counter-statement of disputed facts, (2) submit exhibits in a separate looseleaf notebook with tabs and an index, (3) highlight relevant portions of exhibits, or (4) submit a separate notebook containing the case law on which he relies in opposing Ford's motion.  Indeed, the exhibits to Blossom's brief in opposition to Ford's motion were submitted to the Court without any tabs or other delineations between the discrete exhibits, requiring the Court to flip through numerous pages each time it sought to locate one of Blossom's exhibits.  For the Court's motion practice guidelines, see http://www.mied.uscourts.gov/_practices/cohn/motion.htm.

6

significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

## B. Analysis

As an initial matter, the Court notes that Blossom did not respond to Ford's arguments with respect to his (1) Title VII gender discrimination claim (Count Two), (2) Title VII disparate impact claim alleging gender discrimination (Count Three), (3) ADEA claim (Count Four), (4) FMLA claim (Count Five), (5) FMLA retaliation claim (Count Six), or (6) ADA claim (Count Seven). Accordingly, Blossom has not satisfied his burden to defeat a motion for summary judgment with respect to these claims. See Anderson, 477 U.S. at 249-50; Moore, 8 F.3d at 340. Accordingly, summary judgment is proper for Counts Two, Three, Four, Five, Six, and Seven. The court proceeds to analyze the parties' arguments with respect to the remaining count, Count One (race discrimination

7

under 42 U.S.C. § 1981).

### 1. Race Discrimination Claim Under 42 U.S.C. § 1981

#### a.

Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts with public and private actors.  42 U.S.C. § 1981.  The statute's protection extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C. § 1981(b).

Section 1981 discrimination claims are analyzed under the analytical framework applicable to Title VII claims.  Christian v. Wal-Mart Stores, Inc., 252 F.3d 862, 868 (6th Cir. 2001).  A plaintiff can prove a case of reverse discrimination in one of two ways: (1) by offering direct evidence that race was a substantial factor in the employment decision, or (2) by offering circumstantial evidence of discrimination.  Weberg v. Franks, 229 F.3d 514, 522-23 (6th Cir. 2000).  "Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  Id. at 522 (internal quotations omitted).  If the plaintiff presents direct evidence of discrimination, the burden of persuasion shifts to the defendant to show that it would have terminated the plaintiff's employment absent any discriminatory motive.  Id.

Alternatively, the plaintiff can offer circumstantial evidence of discrimination using the McDonnell Douglas burden-shifting paradigm.  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  Under this standard, the plaintiff is required to show circumstantial

8

evidence from which a jury could draw an inference of discrimination.  <u>Singfield v. Akron Metro. Housing Auth.</u>, 389 F.3d 555, 561 (6th Cir. 2004).  In doing so, the plaintiff establishes a <u>prima</u> <u>facie</u> case with proof of the following:

    (1)    that he is a member of a protected group;

    (2)    that he was subject to an adverse employment action;

    (3)    that he was qualified for the position from which he was terminated; and

    (4)    that he was treated differently than employees outside of the protected class for the same or similar conduct.

<u>Id</u>.  The Sixth Circuit has adapted this four-prong test to cases of reverse discrimination.  <u>Sutherland v. Mich. Dep't of Treasury</u>, 344 F.3d 603, 614 (6th Cir. 2003).  To satisfy the first prong, "the plaintiff must demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority."  <u>Id</u>.  To satisfy the fourth prong, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class.  <u>Id</u>.

Once the plaintiff establishes a <u>prima</u> <u>facie</u> case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the adverse employment action.  <u>Burdine</u>, 450 U.S. at 253.  If the defendant meets this burden, the burden of production shifts back to the plaintiff to demonstrate that the proffered reason is a pretext.  <u>Id</u>.

**b.**

Ford says that Blossom has not offered direct evidence of discrimination. Blossom does not respond to this argument.  He testified at his deposition that nobody at Ford ever made a racist statement to him.  Accordingly, as he has not proffered direct evidence of discrimination, the only way for Blossom to succeed on his claim is to establish circumstantial evidence of discrimination.

Under the circumstantial evidence standard applicable to reverse discrimination cases, Blossom first must establish that background circumstances support the suspicion that Ford "is that unusual employer who discriminates against the majority." Sutherland, 344 F.3d at 614.  Blossom's response to Ford's motion relies on a smattering of exhibits unrelated to the issues presented in this case, including a deposition transcript, an affidavit, and a complaint and answer from three separate cases against Ford in Wayne County, Michigan, Circuit Court; Internet articles from 1999 regarding diversity at Ford; and an affidavit from Wheeler Stanley, who affirmed that he hired Blossom at Ford's Wayne plant in May 1992 and that Blossom "performed all his job duties well."[5]  Blossom's brief fares no better.  His brief is unorganized, contains scant citations to legal authority and many legal conclusions with no support, and does not apply the law to the facts of this case.

Blossom says that the answer to his discrimination claim "lies in the 'culture' and events that existed at the Ford Motor Company between May of 2001 and January of

---

[5] Of particular note with respect to Stanley's affidavit is the fact that Stanley did not work at the Wixom plant where Blossom worked since 1999.  Accordingly, his affidavit is of no probative value to rebut Blossom's Wixom plant supervisors' performance evaluations.

10

2002." He then, however, proceeds to quote a <u>1999</u> speech of Jacques Nasser (Nasser), Ford's former president and chief executive officer, in which Nasser said "one area in which you can expect to see change is the diversity of our employees." Blossom then refers to a 1999 Internet article about a diversity program at Ford. He claims that Ford maintained illegal "diversity quotas" and that Ford planned to reduce white males in its workforce and replace them with minorities and women. He, however, presents no evidence to support this conclusion.

Blossom next discusses Ford's "ABC" performance evaluation system and the company's Leadership Development Competency Assessment (LDCA) form. Blossom says that the ABC system was a means Ford used to reduce white males from its staff. He does not, however, offer support for this conclusory statement. Kachadoorian affirmed that Ford's Performance Management Process used an "ABC" rating system and that an employee's race, gender, or age played no part in the company's assessment of an employee under this rating system. Kachadoorian affirmed that Blossom received a "B" performance rating in 2000 and a rating of "needs improvement" in 2001.

Blossom next discusses Ford's "New Vision Objective," which he says is an affirmative action plan that required the discharge of white, older male employees. He again cites no support for this conclusion. Blossom then proceeds to mention Ford's "Tiering Assessment Process." Kachadoorian affirmed that tiering is a method by which a Ford employee's management group assesses the employee's long-term potential rather than his or her current job performance. Blossom fails to offer evidence of how the tiering system proves any element of a <u>prima facie</u> reverse race discrimination case.

11

Finally, Blossom states that Ford rehired him in 2004 for one week.  The record, however, belies this statement.  Blossom testified at his deposition that he was hired by a temporary staffing agency, G-Tech, that placed him at Ford's Dearborn truck plant. He testified that G-Tech paid his salary while he worked for one week at Ford's Dearborn plant.

In sum, nothing in Blossom's brief or its supporting exhibits offers probative evidence of a <u>prima</u> <u>facie</u> case of reverse race discrimination.  Significantly, the only deposition transcript of record is Blossom's.  Ford says that Blossom did not depose anybody who evaluated his job performance or was involved in the decision to terminate his employment.  Blossom attempts to link a series of unrelated exhibits from other cases, Internet articles, and conclusory statements to support his theory that Ford terminated him because he is a Caucasian male.  He simply has failed to satisfy the burden required of him to defeat a motion for summary judgment.

SO ORDERED.


 s/Avern Cohn
Dated:  June 21, 2005                          AVERN COHN
                                UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was sent to counsel of record on this date, June 21, 2005, by electronic and/or ordinary mail.

 s/Julie Owens
                                Case Manager, (313) 234-5160

12